548 A.2d 506

**STATE of Maryland**

v.

**Eugene S. COLVIN a/k/a Eugene Sherman Colvin–El.**

**No. 88, Sept. Term, 1986.**

Court of Appeals of Maryland.

Oct. 14, 1988.

4

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

John H. Morris, Jr. (Bert Black and Venable, Baetjer & Howard, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

In August 1981 Eugene Sherman Colvin, a/k/a Eugene Sherman Colvin–El (Colvin–El) was found guilty of first degree murder, robbery with a deadly weapon and daytime breaking and entering by an Anne Arundel County jury. That same jury sentenced Colvin–El to death. We affirmed on direct review. *Colvin v. State*, 299 Md. 88, 472 A.2d 953,

*cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984) (*Colvin-El I*). On post conviction review the Circuit Court for Anne Arundel County denied any relief as to the guilty verdict. That court, however, vacated the death sentence and ordered a new capital sentencing hearing because at the original sentencing the State introduced adult criminal convictions of Colvin-El obtained under an unconstitutional procedure which had been utilized only in Baltimore City against persons between the ages of sixteen and eighteen. After leave had been granted, the State and Colvin-El presented cross appeals.

We shall affirm. There is no basis for relief from the verdict of guilty of first degree murder. We agree with the circuit court that the use made against Colvin-El of the prior convictions violates equal protection. A new sentencing hearing is required in any event because the procedure employed at Colvin-El's sentencing by a jury is indistinguishable from the procedure invalidated in *Mills v. Maryland,* —— U.S. ——, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

Colvin-El's principal contention in support of a complete new trial is the claimed ineffectiveness of his trial counsel, Robert W. Payne (Payne), a private attorney assigned by the Public Defender's Office. We reject this contention in part I. In part II we address and reject other issues which go to guilt or innocence. We explain in part III why Colvin-El's current death sentence is vacated, subject to the State's right to seek another death sentence.

I

A

The standards to be applied to claims of constitutionally deficient representation were announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Those standards were painstakingly analyzed by Judge Orth, writing for this Court in *Harris v. State,* 303 Md. 685, 695–701, 496 A.2d 1074, 1079–82 (1985). The *Strickland* standards, as reviewed in *Harris,* were distilled by Chief Judge Murphy for this Court in *State v. Tichnell,*

**6**

306 Md. 428, 441–42, 509 A.2d 1179, 1185–86, *cert. denied,*
479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), saying:
   A two-part test was articulated in *Strickland, i.e.,* that to
   establish a claim of ineffective assistance of counsel the
   defendant must show both that (1) counsel's performance
   was deficient and (2) that the deficient performance preju-
   diced the defense. [Citations omitted.]
   The prejudice component of *Strickland* "requires show-
ing that counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable."
[466 U.S.] at 687, 104 S.Ct. at 2064. Accordingly, as we
said in *Harris, supra,* 303 Md. at 700, 496 A.2d 1074,
citing *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2068, it is
not enough for the defendant merely "to show that the
errors had *some conceivable effect* on the outcome of the
proceeding, or that the errors *impaired* the presentation
of the defense." (Emphasis in original.) The burden is
on the defendant to establish "that there is a reasonable
probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different."
*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Further-
more, a reasonable probability is " 'a probability suffi-
cient to undermine confidence in the outcome.' " *Id.*
   The Supreme Court has illustrated the first component of
*Strickland* in *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct.
3114, 97 L.Ed.2d 638 (1987), and the second component in
*Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91
L.Ed.2d 305 (1986). *Burger* was a federal habeas corpus
review of a Georgia death sentence. At the time of the
murder the defendant was seventeen years old. His effec-
tive I.Q. was 82 and he had no criminal record known to the
prosecutors. Defense counsel did not present at the sen-
tencing hearing any proof designed to establish mitigating
circumstances. Defense counsel's principal reason was a
concern, supported by psychological testing, that the de-
fendant would have shown no remorse and might have
bragged about the crime. A majority of the Court held
"that counsel's decision not to mount an all-out investiga-

tion into [the defendant's] background in search of mitigating circumstances was supported by reasonable professional judgment." 483 U.S. at ——, 107 S.Ct. at 3126.

*Kimmelman* discussed the prejudice element where the principal allegation of ineffectiveness was defense counsel's failure to move, within the time permitted under New Jersey's procedure, to suppress illegally seized evidence, specifically, a sheet from a bed on which the victim had allegedly been raped. The Court, through Justice Brennan, held that, in addition to objectively deficient performance, "the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." 477 U.S. at 375, 106 S.Ct. at 2583. Because the lower courts in *Kimmelman* had not utilized the *Strickland* approach to evaluating prejudice, the Court remanded for that determination.

With these constitutional principles in mind we turn to Colvin–El's claim of denial of the right to counsel through ineffective representation. Understanding that claim requires a review of the facts.

### B

On September 9, 1980, between approximately 1:00 and 2:30 in the afternoon, Lena Buchman, age 82, was murdered in her daughter's home at 6806 Cherokee Drive in the Pikesville section of Baltimore County. Mrs. Buchman, a resident of Florida, had flown to Baltimore that morning to visit her daughter, Mrs. Majorie Sorrell. Both Mr. and Mrs. Sorrell were out of the house, at work, when the murder occurred. Mrs. Buchman was last seen alive by her granddaughter, Ms. Susan Sorrell, who left her alone in the house at approximately 1:00 p.m.

Cherokee Drive is a quiet street in a predominately white neighborhood of individual homes. The only black family is the Hayes household at No. 6804, immediately south of the

Sorrells on the west side of Cherokee Drive. The Sorrells' property is improved by a split level residence. Its main entrance, on the street side at ground level, opens onto an entrance hall. The living room is to the left of one entering, the kitchen is in the rear of the ground level, straight on from the front door, and a dining area is on the rear, south side. Between the entrance hall and kitchen are two sets of stairs, one to the upper, bedroom area of the house and the other to the lower, basement area. There is a rear door in the kitchen at roughly ground level. On the exterior of the rear of the house, below ground level, is a stairwell to a door to the basement. That door is hinged to open into the basement.

At approximately 2:30 p.m. on the day of the murder, Mrs. Nanette Flax returned to her home at 6808 Cherokee Drive and noticed the Sorrells' dog running loose and unsupervised, a most unusual occurrence. She retrieved the dog, hooked it by its leash to a wire run and went to the main entrance of the Sorrells' house to relate those events to whomever was home. Getting no response to her knock, Mrs. Flax opened the unlocked screen door and stepped through the doorway of the solid, wooden front door, which was standing open. She glanced down and saw a body lying in a pool of blood at the foot of the stairs leading to the bedroom area.

Mrs. Buchman had been stabbed or slashed with a knife twenty-eight times. Some of the cuts were defensive cuts on the hands. Blood was splattered up the stairway but not as far as the upper end of the stairs. The knife, one from the Sorrells' kitchen, was found at the foot of the basement stairs. The master bedroom had been ransacked and jewelry taken.

Glass in the exterior basement door had been broken and the police found pieces of the glass lying on the steps of the exterior stairwell. That door is wood from its bottom to a level slightly above the knob. Above the wood are wide, rectangular glass panes, one above another. The pane immediately above the door knob had been broken. The

center of the impact to that glass was on the knob side of the door which is the left side to one facing the door while standing in the basement.

Detective Darrell Sturgeon, an experienced police officer and crime lab technician, dusted the crime scene for fingerprints. He obtained twelve latent fingerprints from the pieces of glass. At that time he did not know whether the prints were identifiable and, if identifiable, whose they were.

The interior side of the basement door was covered for the width of the window panes and from the top of the door to a level approximately one foot from the floor by a curtain made of a floral print material. In addition to a lock in the door knob there were two chain locks on the door, one at knob level and the other roughly two feet higher. The Sorrells rarely used this basement door and kept an ironing board in a folded position leaning against the knob side of the door. On the morning of the day of the murder, Mrs. Sorrell had observed the basement door and the folded ironing board was leaning against it as usual. Ms. Susan Sorrell also testified at trial that, when she had stopped by for lunch with Mrs. Buchman, the basement door was locked and chained and there was nothing unusual about it. Police photographs of the basement area around the door taken facing the interior of the door at 4:20 p.m. on the day of the murder show the folded ironing board lying on the floor in front of the knob side of the door and show the two chains for the night locks hanging from the door frame, unconnected to the door.

Detectives Sturgeon and J. Biltz filed a joint report of their investigation at the crime scene. The report included the observations that

[t]he lock on the knob of the [exterior basement] door was not locked and the door could be opened, but only approx. 4 inches as there was a white metal storage cabinet on the inside of the door. No other signs of forced entry could be found.

The same photographs of the basement area near the door also show a white metal storage cabinet in front of the hinged side of the door standing to a height slightly above that of the door knob. The back of the cabinet is flush against a wall which is perpendicular to the exterior wall in which the door is set. The front of the metal cabinet extends beyond the hinged edge of the door to a point approximately half way across the width of the door. On the opposite side of the door from the storage cabinet and extending perpendicularly from the exterior wall were a clothes dryer and a clothes washer. The distance between those two machines and the storage cabinet is only several inches more than the width of the ironing board.

A fact finder could find that one attempting to open the basement door from the outside would not see the storage cabinet because of the curtain over the windows of the door. Furthermore, even if all of the locks on the door had been unlocked, a fact finder could conclude that the door would not open more than the four inches described in Det. Sturgeon's report because the door would strike the cabinet and the cabinet would not move because it butts against the wall. A fact finder could also believe that, had the folded ironing board been leaning against the knob side of the door in its described, customary position, anyone attempting to enter the basement by opening the door would knock the folded ironing board to the floor.

As part of the investigation on the day of the murder, Officer J.K. Roger of the Baltimore County Police conducted inquiries in the neighborhood and made a written report of the results. Ms. Wendy Janofsky of 6817 Cherokee Drive said that at approximately 2:05 p.m. she had observed four persons in the 6800 block Cherokee Drive. There were two black males walking north in front of her house. There was a black male riding a bicycle northbound on Cherokee, who turned and left in a southerly direction. She also saw a white female at the door of 6812 Cherokee who "appeared to be collecting or doing a survey." Officer Roger also interviewed Clarence Hayes, the Sorrells' neighbor to the

south. Mr. Hayes identified his black bicycle with a baby seat on the rear and with a long pole bearing multi-colored streamers at the top. That bicycle had been found in the Sorrells' driveway. According to Off. Roger's report Mr. Hayes stated that he had left 6804 Cherokee Drive at approximately 2:15 p.m. and that at that time "the bike was in his backyard next to the patio with a flat tire & he [was] not sure if the chain was off or not." [1]

The Sorrells' jewelry taken during the robbery had been recently appraised in a written appraisal dated June 27, 1980, which set forth detailed descriptions. The appraiser had also photographed the appraised pieces. The written appraisal and the photographs were turned over to the police. One item was an "Elgin, gold-filled pocket watch with safety pinion Elgin National Watch Co. movement (No. 13198679, case No. 892298)."

In a report of September 11, 1980, Detective Roeder of the Baltimore County Police recorded that he had that day gone to the Sorrell home to photograph and take custody of additional evidence, a ring and a bracelet which had been found lying on the Sorrells' driveway.

All of these reports had been furnished to Colvin–El's attorney, Payne, in open file discovery.

On January 8, 1981, Colvin–El was arrested at his home at 608 North Brice Street in Baltimore City by the Baltimore City Police on a warrant charging a breaking and entering on December 2, 1980, in the Roland Park section of Baltimore City. Seized from his person at that time was a Maryland Motor Vehicle Administration age of majority card No. C415–237–765–777 in the name of Eugene Sherman Colvin of 615 Brice Street. That address seems to have been the home of Colvin–El's sister where he lived from time to time prior to acquiring the house across the

---

1. At the post conviction hearing on June 3, 1985, Mr. Hayes testified that the bike did not have a flat tire when he left home on the day of the murder. The bike was found later in the Sorrell driveway with a flat tire.

street at 608 North Brice. That card had been presented by the person identifying himself as Eugene Colvin who had sold property taken in the Roland Park offense at a pawn-broker, Metro Brokers Ltd.

On January 13, 1981, Det. Michael Parks of the Baltimore County Police rolled from Colvin–El's fingers a complete set of ink fingerprints onto cards. That same day the rolled prints were matched to the latent fingerprints found on the glass from the basement door at the Sorrell home. The Baltimore County Police immediately obtained and executed an arrest warrant charging Colvin–El with the Buchman murder.

Each pawnbroker in Maryland is required to file certain records containing specified information with the primary law enforcement agency in the county for which the pawn-broker is licensed. See Md.Code (1957, 1983 Repl.Vol.), Art. 56, § 422. On January 27, 1981, Det. Parks reviewed those records filed with the Baltimore City Police. They revealed that a person identifying himself as Eugene Colvin–El had pawned items at Northwestern Loan Company on Pennsyl-vania Avenue in Baltimore City on September 17, 1980. At Northwestern Loan Company Det. Parks found that one item pawned in the name of Colvin–El eight days after the murder was a gold pocket watch which fit the description of the pocket watch taken from the Sorrell home. A man's Timex watch was also pawned that day in a separate transaction in the name of Colvin–El. Although not initially included among the stolen property listed by the Sorrells, Mrs. Sorrell advised the police that a watch similar to the Timex was also missing. Det. Parks took custody of both watches and they were introduced into evidence at trial.

Colvin–El elected a jury trial for both guilt or innocence and sentencing. At the hearing on guilt or innocence Det. Sturgeon testified that the point of entry into the Sorrell home was the outside basement door. Payne did not cross-examine about the point of entry. Colvin–El chose not to testify and Payne presented no proof of any kind at the guilt or innocence stage.

The jury found Colvin–El guilty of first degree murder, of robbery with a deadly weapon and of daytime housebreaking. In response to special interrogatories submitted to the jury to be answered in the event the verdict was guilty of first degree murder, the jury replied that the murder verdict was based on premeditation and on the killing's having been committed in connection with each of robbery with a deadly weapon and daytime housebreaking.

At the post conviction hearing the neighbors testified generally in accordance with their police interview statements and Ms. Wendy Janofsky's statement was basically corroborated by her mother.

On this post conviction appeal Colvin–El principally rests his ineffectiveness of counsel argument on the absence of any use by Payne of the above-described information contained in the police reports. Det. Sturgeon was not cross-examined concerning the apparent impossibility that the basement door was the point of entry. Also, from the fact that the police discovered two items of the stolen jewelry on the driveway two days after the murder, it is contended that Payne should have developed a sufficiently strong suggestion that Colvin–El found the watches to generate a reasonable doubt whether he was the actual thief. Colvin–El further submits that evidence of the use of the Hayes's bike and of the presence of unknown black males in the 6800 block of Cherokee Drive during the period when the murder occurred should have been utilized to generate a reasonable doubt whether Colvin–El was involved at all. Further, because Md.Code (1957, 1976 Repl.Vol., 1981 Cum. Supp.), Art. 27, § 413(e)(1) requires that a defendant be guilty of murder in the first degree as a principal in the first degree in order to be eligible for the death penalty, Colvin–El asserts that evidence available from neighbors should have been utilized by defense counsel to create at least a reasonable doubt whether Colvin–El was the person

who actually stabbed Mrs. Buchman.[2]

## C

■ None of the foregoing demonstrates the reasonable probability that Colvin–El would have been found innocent of first degree murder and of the underlying felonies if Payne had utilized the specified information for cross-examination or as evidence in a defense case. First, none of this Monday morning quarterbacking casts any doubt on the fact that Colvin–El was present at the basement door of the Sorrell home after Ms. Susan Sorrell had left and before Mrs. Buchman's body was found. The State's expert witness on fingerprints was Det. Cpl. James Sims. At the time of trial, Dept. Cpl. Sims had been the fingerprint examiner in the Baltimore County crime lab for over five years and had checked about 258,000 fingerprints in 21,000 cases. Two latent right thumbprints and two latent right index fingerprints which had been taken from the glass matched the ink rolled fingerprints taken from Colvin–El. With respect to one of the thumbprints the match was made in forty-eight particulars. In Sim's opinion, only seven points of identification in one print are ordinarily sufficient. He considered the latent prints to be "absolutely excellent" with respect to detail. He said there has never been a reported case anywhere in the world in which two different people had the same fingerprints. Thus, it is fanciful to suggest, as Colvin–El does, that Payne should have caused the jury to be uncertain whether Colvin–El was the thief because he might have found the jewelry or might have received it from the true thief sometime after the crime. That does not explain away the fingerprints.[3]

---

**2.** Unless otherwise indicated all references to Art. 27, §§ 412–413 are to the above-cited Code, establishing the death penalty and the procedure for its imposition at the time of the subject offense, trial and sentencing.

**3.** Similarly there could be no prejudice from Payne's alleged deficiency in failing to request and obtain an instruction that the jury could find that Colvin–El was only a receiver of the stolen goods.

Colvin–El's only explanation, suggested in his testimony at the sentencing phase, was that he was "framed" by the police. The post conviction record, however, reveals that Payne, prior to trial, had engaged an independent fingerprint expert to review the State's fingerprint evidence. That expert found Colvin–El's fingerprints to be "somewhat unique" and "easy to identify."

In addition, there is no doubt that Colvin–El shared in the loot. The Elgin watch recovered by Detective Parks from Northwestern Loan Company bore movement No. 13198679 and case No. 892298. Armond Kessler, the pawnbroker who handled the transaction, testified and produced original records which showed that the person who had pawned that watch on September 17, 1980, identified himself as Eugene Colvin–El of 615 Brice Street. The pawnbroker's retained copy of the document evidencing the transaction contains in his handwriting a contemporaneous record of the proofs of identification furnished by the person who presented the watch. One proof was Motor Vehicle Administration age of majority card No. C415–237–765–777, the same card bearing Colvin–El's name, picture and Brice Street address which had been taken from Colvin–El's person when he was arrested by the Baltimore City Police. The second proof presented to the pawnbroker was Baltimore City Department of Social Services identification card No. C–032679. A witness from the Department of Social Services testified that her agency had assigned that number to Eugene Sherman Colvin–El of 608 North Brice Street. The pawnbroker also testified that the person who presented the pocket watch matched the picture on the age of majority card and that the signature of that person on the transaction document matched the signature on the age of majority card.

The information developed at the post conviction hearing does not generate any reasonable probability that Colvin–El was not at least an accomplice in the murder. If the basement door was only a point of attempted entry, and not a point of actual entry as Det. Sturgeon testified, the

discrepancy does not undermine the fact that someone entered the house, murdered Mrs. Buchman and stole jewelry and other property. There is no reasonable probability that Payne could have done anything to alter the fundamental fact that Colvin–El was present and at least aiding and abetting the daytime housebreaking and robbery.

■ To test whether Colvin–El's claim of ineffective representation can satisfy *Strickland*'s prejudice requirement with respect to the guilty verdict, we shall assume, *arguendo*, that effective representation probably would have caused the jury to conclude that one or more persons, in addition to Colvin–El, also participated in the housebreaking and robbery and that effective representation probably would have caused the jury reasonably to doubt whether Colvin–El was the actual wielder of the knife. On that assumption, Colvin–El is nevertheless guilty of murder in the first degree. Under § 30(b) "[a]ny person, his aiders, abettors and counsellors, who shall be convicted of the crime of breaking a dwelling house in the daytime with intent ... to steal, take or carry away the personal goods of another of any value therefrom, shall be guilty of a felony...." Under § 410 "[a]ll murder which [is] committed in the perpetration of, or attempt to perpetrate, any ... robbery ... or daytime housebreaking as defined in § 30(b)" is murder in the first degree. Even if a co-felon stabbed Mrs. Buchman, Colvin–El committed murder in the first degree at least as an accomplice or principal in the second degree. *See Stevens v. State*, 232 Md. 33, 192 A.2d 73, *cert. denied*, 375 U.S. 886, 84 S.Ct. 160, 11 L.Ed.2d 115 (1963); *Boblit v. State*, 220 Md. 454, 154 A.2d 434 (1959), *second appeal dismissed sub nom. Brady v. State*, 222 Md. 442, 160 A.2d 912 (1960); *Shockley v. State*, 218 Md. 491, 148 A.2d 371 (1959). Therefore, there is no prejudice in the verdict of guilty based on the claimed ineffective representation.

■ Any prejudice from the claimed ineffectiveness was necessarily limited to the sentencing phase of the original trial. This prejudice, if any, is cured by vacating the death

sentence and remanding for a new sentencing proceeding which we mandate for the reasons explained in part III hereof. The fact that the jury at the original trial based its verdict of guilty of murder in the first degree on premeditation, as well as on felony murder, does not result in any prejudice which is not cured by the new sentencing hearing. This is because the finding of premeditation is immaterial in the context of the new sentencing hearing. The original finding of premeditation was for the information of the judge at the original trial for use in sentencing on the underlying felonies of which Colvin–El was found guilty. The purpose of having the jury answer a special interrogatory defining whether a verdict of guilty of murder in the first degree is based on premeditation, felony murder or both is to avoid the improper sentencing which would occur if the jury based its verdict only on felony murder and the judge were to impose a sentence for the merged felony in addition to a court or jury imposed sentence for the first degree murder. *See State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978), *aff'g Frye v. State*, 37 Md.App. 476, 378 A.2d 155 (1977).[4]

The prejudice claimed by Colvin–El does substantially affect whether Colvin–El was a principal in the first degree. That is, however, an issue which will be decided at the new sentencing hearing. *See* Maryland Rule 4–343(e), "FINDINGS AND SENTENCING DETERMINATION" form, Section 1, Question 1.[5] Whether Colvin–El stabbed Mrs.

---

[4] In the instant case, after the jury imposed the death sentence, the judge did not sentence on the underlying felonies. In *White v. State*, 300 Md. 719, 481 A.2d 201 (1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985), we held that the effect of a somewhat similar disposition was to suspend sentence generally on the convictions as to which no specific sentence was imposed.

[5] Under Rule 4–343 the first question which the sentencing authority answers at a sentencing proceeding is whether "[t]he defendant was a principal in the first degree to the murder." This special interrogatory was added to the capital cases sentencing form as part of the revisions of Rule 4–343 which were unanimously adopted by this Court on July 27, 1987 and which became effective August 17, 1987.

Buchman to death will be decided by the sentencing authority on the basis of the record made at the new sentencing hearing. *See Tichnell v. State*, 290 Md. 43, 63, 427 A.2d 991, 1001 (1981) (*Tichnell II*). In *Colvin–El I*, we sustained the sufficiency of the evidence of premeditation based upon the multiple stab wounds and the evidence that the murderer carried the knife from the kitchen to the foot of the upstairs stairway where, based on the amount of blood, the stabbing occurred. *Colvin–El I*, 299 Md. at 107–10, 472 A.2d at 962–64. This same evidence will be available to the State as a basis for arguing at the new sentencing that Colvin–El was the principal in the first degree. But the State may not present the finding by the original jury to a new jury on resentencing. If resentencing by a judge is

---

Without any mention of Rule 4–343 the dissenting opinion concludes that the principal in the first degree issue must be determined during the guilt or innocence phase "under the clear language of the statutory mandate." The dissent's "statutory mandate" is based on an interpretation of subsections 413(a) and (e) of Art. 27. Under subsection (a) "[i]f a person is found guilty of murder in the first degree ... a separate sentencing proceeding shall be conducted ... to determine whether he shall be sentenced to death." Under subsection (e)(1) "person" includes "only a principal in the first degree" when used in § 413 "unless a contrary meaning is clearly intended from the context in which the term appears[.]" The dissent concludes that there is no authorization for any sentencing proceeding unless the finding of principal in the first degree has previously been made during the guilt or innocence phase of the trial.

One premise underlying our above-quoted amendment to Rule 4–343 is that "person" was not intended to be limited, in the context of § 413(a), to one previously found to be a principal in the first degree. This conclusion may be illustrated by an example. Assume a murder during the course of an armed robbery committed by two persons. The defendant's position is that the other robber is in fact the principal in the first degree to murder. There is, however, circumstantial evidence legally sufficient to support a finding that the defendant is a principal in the first degree to murder. If the first degree principal issue must be determined exclusively at the guilt or innocence phase, the robber who claims to be only an aider and abettor in the murder is compelled at that phase to admit participation in the robbery and murder in order to attempt to avoid the death penalty by testifying that the co-principal was the actual killer. The serious constitutional questions presented by that procedure are avoided by the broader interpretation of "person" in the context of § 413(a) which underlines Rule 4–343.

elected, then the judge may not consider the prior finding of premeditation as tending to show that Colvin–El was a principal in the first degree. To do so would defeat the remedial purpose of a new sentencing hearing at which the determination of sentencing issues is to be based solely on facts presented at that hearing. Of course, if on the record as a whole at a new sentencing hearing the fact finder could conclude that Colvin–El carried the knife from the kitchen and repeatedly stabbed the victim, the State is free to argue not only that Colvin–El is the principal in the first degree, but also that he acted with premeditation which should be considered in weighing whether the death penalty should be imposed.[6]

Consequently, any prejudice to Colvin–El resulting from Payne's lack of utilization of information concerning the presence of strangers in the neighborhood during the time when the crime might have occurred, and concerning the movement of the Hayes's bicycle, affects only the issue of whether Colvin–El was a principal in the first degree. Our mandate on this appeal ordering a new sentencing hearing cures this problem.

## II

The remainder of Colvin–El's cornucopia of points which go to guilt or innocence can be succinctly addressed.

## A

At the time of the Buchman murder § 413(d)(10) did not include as capital murder a murder committed while committing or attempting to commit daytime housebreaking, but it did include murder while committing or attempting to commit robbery. Colvin–El claims ineffec-

---

6. If, contrary to the facts here, the jury had been asked to specify if the murder was premeditated and the jury had found that it was not, but had found murder in the first degree based only on felony murder, we have grave reservations under principles of double jeopardy or estoppel whether the State would be free to argue premeditation at a new capital sentencing hearing.

tiveness with respect to the jury instruction on robbery. The claim is not that the instruction as given was incorrect, but that Payne should have obtained additional instructions which would have permitted the jury to find that there was no robbery. One of Colvin–El's robbery theories is that, because the jewelry and other property were taken from the master bedroom and because the stabbing occurred at the foot of the stairs, the taking did not occur in Mrs. Buchman's presence. This is not the law. Robbery convictions have been sustained where the victim was in one room of a house or place of business and the property was taken from another room. *See State v. Campbell,* 41 Del. 342, 22 A.2d 390 (Del.Ct.Gen.Sessions 1941); *State v. Calhoun,* 72 Iowa 432, 34 N.W. 194 (1887); *Commonwealth v. Homer,* 235 Mass. 526, 127 N.E. 517 (1920); *State v. Williams,* 183 S.W. 308 (Mo.1916); *State v. Culver,* 109 N.J.Super. 108, 262 A.2d 422 (App.Div.1970); *State v. Cottone,* 52 N.J.Super. 316, 145 A.2d 509 (App.Div.1958); *State v. Mosley,* 102 Wis.2d 636, 307 N.W.2d 200 (1981). Indeed, convictions have been sustained where the victim was in a building and personalty kept outside the building was taken. *See Cobern v. State,* 273 Ala. 547, 142 So.2d 869 (1962); *State v. Hayes,* 518 S.W.2d 40 (Mo.1975). Further, and contrary to another of Colvin–El's arguments, Colvin–El can be convicted of robbery even though Mrs. Buchman was not the owner of the jewelry. We agree with *State v. Cottone,* 52 N.J.Super. at 323, 145 A.2d at 513 where the court said that a maid, who was the sole occupant of the home, "was in charge of everything contained therein against anyone except the [owners]." Payne was not deficient in failing to obtain instructions to which Colvin–El was not entitled.

## B

■ Colvin–El contends that Payne should have objected when the State asked Mrs. Sorrell if her mother had been in the "habit" of carrying money in her wallet. The witness replied affirmatively. This is said to be inadmissible evidence of habit. We do not agree that this is even habit

evidence. The proof was that Mrs. Buchman had arrived that day from Florida, that she intended to stay in Baltimore for one week and then to go to the Midwest to visit her son before returning to Florida. The wallet in question had an exterior change purse which could be snapped closed. After the murder the wallet was found in an unzippered, opened hand or shoulder bag, with no currency in the billfold part of the wallet and with the change purse unsnapped, opened, and empty. It was permissible for the jury to infer based on common experience, and independently of any habit of the victim, that Mrs. Buchman would not travel for the times and distances shown by the evidence without carrying some money. The jury could also infer that a woman who carries a handbag containing a wallet, as did Mrs. Buchman, usually keeps her money in the wallet and change purse. Had Payne made any objection, it should not have been sustained.[7]

## C

█ Colvin–El further contends that Payne should have objected to testimony from Mrs. Sorrell which described her mother's background and general good health. The testimony condensed eighty-two years of Mrs. Buchman's life into approximately two and one-half pages of double spaced, typewritten testimony on wide margin pages. The State is permitted to have the victim briefly and nonprejudicially described and we see no prejudice in Mrs. Sorrell's testimony. It is comparable to that approved in *Grandison v. State*, 305 Md. 685, 728, 506 A.2d 580, 601, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986).

█ Further, Payne testified on post conviction not only that he did not consider the testimony prejudicial but also that he considered it would have been prejudicial to have objected. The trial court found counsel's decision to be

---

7. The relevance of this argument by Colvin–El is unclear since the State did not charge Colvin–El with robbery by taking money belonging to Mrs. Buchman.

within the bounds of trial strategy. We agree. Counsel could understandably expect that the jury would resent objections designed to keep them from knowing some basic information about the person who had been murdered.

■ Colvin–El is wide of the mark in arguing that the testimony violates the proscription of victim impact statements under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The testimony here did not attempt to describe the effect of the murder on Mrs. Buchman's family. For the same reasons, the absence of objection to the State's reference to the victim's personal history in its opening statement, to Ms. Susan Sorrell's reference to aspects of her grandmother's background, and to the introduction of a photograph of Mrs. Buchman taken during her lifetime and depicting her head and shoulders, do not demonstrate ineffectiveness of counsel.

### D

■ On direct appeal in this case we concluded that Colvin–El had failed to make a prima facie case of systematic racial discrimination in his challenge to the jury array. That challenge was presented for the first time on direct appeal based upon data appended to Colvin–El's brief. We considered the argument on the merits and conducted an independent constitutional review. *Colvin–El I*, 299 Md. at 103–07, 472 A.2d at 960–62. Now, on post conviction, Colvin–El has utilized substantially the same data to present the same argument disguised as ineffectiveness of counsel. Payne could not have been deficient by not making an argument which we have held has no merit.

### E

When submitting guilt or innocence to the jury, the trial court instructed that art. 23 of the Maryland Declaration of Rights made the jury the judge of the law, and that as a result the court's instructions were advisory only and not binding. In conformance with *Stevenson v. State*, 289 Md.

167, 423 A.2d 558 (1980), however, the court went on to instruct that the jury was to perform its role as judge of the law only where there was a suggested conflict. Further, the court instructed that on the constitutional precepts such as burden of proof and need for unanimity, its instructions were binding and could not be disregarded. Colvin–El, citing *Giaccio v. Pennsylvania*, 382 U.S. 399, 403, 86 S.Ct. 518, 521, 15 L.Ed.2d 447, 450 (1966) contends that he was thereby deprived of due process because he was not tried in accordance with the law of the land and because the instruction was confusing. He also criticizes the reasonable doubt instruction.

▆▆ There were no exceptions taken to these instructions. On direct appeal when Colvin–El was represented by new counsel, the points were not presented. Under Md. Code (1957, 1987 Repl.Vol.), Art. 27, § 645A(c), part of the Post Conviction Procedure Act, failure to make the allegations is presumed to have been done intelligently and knowingly. Nothing is presented here to rebut the presumption.

To the extent that Colvin–El rests his ineffectiveness of counsel argument on the absence of any exceptions to these instructions, we find neither deficient representation nor prejudice in light of the instructions, taken as a whole.

## F

▆▆ Colvin–El's remaining submission on guilt or innocence is that, if none of his above arguments clear the *Strickland* hurdles of ineffectiveness and prejudice, then this Court should depart from *Strickland* and establish a Maryland test of ineffectiveness utilizing the provision of art. 21 of the Declaration of Rights "[t]hat in all criminal prosecutions, every man hath a right ... to be allowed counsel...."

A contention similar to that made by Colvin–El was presented in *Lodowski v. State*, 307 Md. 233, 513 A.2d 299 (1986). *Lodowski* was a remand by the Supreme Court for reconsideration in light of *Moran v. Burbine*, 475 U.S. 412,

106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). In *Burbine*, the Court, applying the sixth amendment to the United States Constitution, held that the right to counsel of an arrestee who had not personally requested counsel was not violated by the failure of the police to advise the arrestee that counsel provided by the arrestee's family was present in the building where the arrestee was being interrogated. Lodowski argued that we should hold under art. 21 of the Maryland Declaration of Rights that there was a denial of the right to counsel under facts similar to those in *Burbine*. That argument was rejected.

> We stated flatly in *State v. Tichnell*, 306 Md. 428, 440, 509 A.2d 1179 (1986): "There is no distinction between the right to counsel guaranteed by the Sixth Amendment [of the U.S. Constitution] and Article 21 of the Maryland Declaration of Rights...." We again set out this view in *Clark v. State*, 306 Md. 483, 487, 510 A.2d 243 (1986). Accordingly, with regard to the allowance of counsel provision of Article 21 of the Declaration of Rights, we adhere to the construction the Supreme Court has placed on the like provision of the Sixth Amendment. [307 Md. at 247, 513 A.2d at 307.]

*Tichnell*, relied upon in *Lodowski*, applied the *Strickland* standards in holding that there was no ineffectiveness of counsel in that death sentence case. Thus, the matter is settled. The standards established in *Strickland* apply to claims of ineffective assistance of counsel under art. 21.

### III

We now turn to the issues affecting only the death sentence.

### A

█ In *Mills v. Maryland*, —— U.S. ——, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held that the potential for uncertainty in a jury's interpretation of the sentencing form for capital cases specified by former Rule 772A violated the eighth amendment's prohibition against

cruel and unusual punishments. The jury which sentenced Colvin–El to death was instructed to utilize, and did utilize, an identical form. Colvin–El's jury found one aggravating circumstance, murder committed while committing robbery, and found no mitigating circumstances. As instructed by the form, the jury did not complete part III where aggravating and mitigating circumstances would be weighed if the jury had found at least one mitigating circumstance. In this respect Colvin–El's case is indistinguishable from *Mills*.

Under § 645A(d) of the Maryland Post Conviction Procedure Act, Colvin–El is entitled to the benefit of any Supreme Court decision holding that the United States Constitution "imposes upon State criminal proceedings a procedural or substantive standard not theretofore recognized, which ... is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence." The *Mills* analysis affects "the very integrity of the fact-finding process" with respect to finding an absence of mitigating factors. Therefore *Mills* applies retrospectively. *See Linkletter v. Walker*, 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601, 614 (1965). Consequently, Colvin–El's death sentence must be vacated.

### B

■ Vacating Colvin–El's death sentence is also required for the reasons stated by the circuit court on post conviction review. At the sentencing hearing the State introduced records of the former Criminal Court of Baltimore reflecting Colvin–El's convictions in 1960 for six burglaries and a conviction in 1962 of a seventh burglary. Concurrent sentences to the State Reformatory for Males for two years were imposed for the 1960 burglaries. The 1962 offense resulted in an additional two year sentence. At the time of his arrest for these offenses Colvin–El was between sixteen and eighteen years of age. At that time, had Colvin–El been arrested and proceeded against outside of Baltimore City, the proceedings would have been under

the Juvenile Causes statute, Md.Code (1957), Art. 26, § 51 *et seq.*

*Long v. Robinson*, 316 F.Supp. 22 (D.Md.1970), *aff'd*, 436 F.2d 1116 (4th Cir.1971) held that this difference in procedure violated the equal protection rights of sixteen and seventeen year old arrestees in Baltimore City whose convictions were not yet final. In *Wiggins v. State*, 275 Md. 689, 344 A.2d 80 (1975), we held that *Long* was not retroactive so that Wiggins, whose conviction as an adult in Baltimore City was final when *Long* was decided, was not entitled to a declaratory judgment nullifying his conviction. But in *Raiford v. State*, 296 Md. 289, 462 A.2d 1192 (1983), we held that the State violated equal protection by using convictions, obtained under the procedure invalidated by *Long*, in order to demonstrate predicate crimes under a sentence enhancing statute.

Here the State argues that *Wiggins* applies, that the 1960 and 1962 convictions of Colvin–El are not nullified by *Long* and that the fact of criminal conduct evidenced by those convictions is in no way undermined. The operative principle is, however, equal protection and not due process. The State made a present use of the prior convictions when it introduced them against Colvin–El at the capital sentencing proceeding and it introduced those convictions as convictions of an adult in the Criminal Court of Baltimore. If another person being sentenced for capital murder had committed the same acts, during the same period, and at the same age as Colvin–El, but outside of Baltimore City and absent a waiver of juvenile jurisdiction, that person's prior record would reflect, at most, findings of juvenile delinquency. The particular jurisdiction within Maryland in which the offense was committed is not a rational basis for this distinction in the present use of the records. We agree with the circuit court's conclusion that equal protection was violated by the admission of Colvin–El's "adult" convictions. We cannot say that the error was harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976).

IV

Of the remaining points presented by Colvin–El some will not necessarily arise again at a new sentencing hearing and are moot. The other points are challenges to the constitutionality of Maryland's death penalty statute which we have previously rejected and which have been presented to preserve the points for possible future consideration by other courts.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.

BLACKWELL, J., dissents, in which ADKINS, J., concurs.

BLACKWELL, Judge, dissenting.

Maryland Code (1957, 1976 Repl.Vol., 1981 Cum.Supp.), Art. 27, § 413(e)(1) requires that a defendant be guilty of murder in the first degree as a *principal in the first degree* to be subject to death penalty sentencing proceedings.[1] To be guilty as a principal in the first degree means to have been found guilty of doing the physical act causing death, such as pulling the trigger of a gun, or wielding of a knife used in stabbing. It is not enough that a defendant be guilty of murder in the first degree as an "aider or abettor" of a co-defendant.

The majority concludes the issue of principal in the first degree can be decided during the sentencing proceeding in the second trial. I conclude under the clear language of the statutory mandate, it must be determined during the guilt innocence phase of a death penalty trial, otherwise a "person" or "defendant" does not qualify under the definitions section of 413(e)(1). Section 413(a) provides:

---

1. Maryland Code (1957, 1976 Repl.Vol., 1981 Cum.Supp.), Art. 27, § 413(d)(7) sets forth an exception to the principal in the first degree qualification: "The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration."

*Separate sentencing proceeding required.*

If a person is found guilty of murder in the first degree, and if the state had given the notice required under § 412(b), a separate sentencing proceeding shall be conducted as soon as practicable after the trial has been completed to determine whether he shall be sentenced to death.

Section 413(e) provides in pertinent part:

*Definitions.*—As used in this section, the following terms have the meanings indicated unless a contrary meaning is clearly intended from the context in which the terms appears:

(1) The terms "defendant" and "person", . . . include *only* a principal in the first degree." (Emphasis added).

Stated in other terms, a person or defendant is not subject to a separate death penalty sentencing proceeding directed by Article 27, § 413(a) unless he (or she) is determined to be a principal in the first degree. That determination must be made prior to the death penalty sentencing proceeding, otherwise no proceeding is authorized by the statute. The requirement of the definition section would not have been met.

The missing ingredient cannot be later supplied during a sentencing proceeding by a jury that is considering evidence which would not have been admissible at trial. Md. Code (1957, 1976 Repl.Vol., 1981 Cum.Supp.), Art. 27, § 413(c). An impartial decision would be unlikely where the panel is confronted with evidence of a prior record, hearsay, or any other information that the court deems probative and relevant to sentencing.

I therefore respectfully dissent from the conclusion that defendant's participation as a principal in the first degree can be determined for the first time during a new sentencing proceeding. I would remand for a new trial.

Judge ADKINS has authorized me to state that he concurs with the views expressed herein.