52 N.J. Super. 316 (1958)
145 A.2d 509
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM COTTONE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1958.
Decided October 27, 1958.
*320 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Benedict W. Harrington argued the cause for appellant (Messrs. Kessler, Kessler & Harrington, attorneys; Mr. Samuel I. Kessler, of counsel; Mr. Harrington, on the brief).
Mr. C. William Caruso, Special Legal Assistant Prosecutor, argued the cause for respondent (Mr. Charles V. Webb, Jr., Essex County Prosecutor, attorney; Mr. Caruso, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was tried and convicted in the Essex County Court for the crime of robbery, upon an indictment charging that on October 27, 1955, in West Orange, N.J., he did "forcibly take from the person of Jacquelynn Davis, one safe of the value of $25.00, money to the value of $2,400.00, jewelry of the value of $43,935.00, in all of the value of $46,366.00, the goods and chattels of Harry Cohen, by violence and putting the said Jacquelynn Davis in fear," contrary to N.J.S. 2A:141-1. The trial consumed five full days. Defendant was sentenced to State Prison for a term of six to eight years.
Defendant now appeals the judgment of conviction, claiming that (1) the State failed to prove a robbery under N.J.S. 2A:141-1; (2) the trial court erroneously substituted its will and judgment for that of the jury in violation of defendant's right to trial by jury; (3) the trial court erroneously refused to grant a mistrial because of the publication of a certain newspaper article; (4) defendant was denied a public trial; (5) the court's charge was erroneous; (6) defendant was denied the right to be confronted by witnesses against him; and (7) the court erred in permitting the State to allude to his prior convictions.
The State's case rested mainly on the testimony of Mrs. Davis, a maid in the Cohen household, who had begun work for the Cohens only four days before the robbery. On October 27, 1955 she was alone in the Cohen home when *321 a man appeared at the kitchen door at about 1 P.M., carrying a package. From his appearance she thought he was a deliveryman, and she described in detail how he was dressed. After entering the kitchen, the man pulled out a gun and said, "This is a holdup." Mrs. Davis was only a foot and a half or two feet away from him. He ordered her to lie on the floor, face down. (At this point in her testimony, Mrs. Davis stepped from the witness stand and identified defendant as the man in question.) A minute or so later two other men entered the kitchen, walked past her and went directly upstairs. Mrs. Davis became a little hysterical, and asked for a glass of water. She said she rose from the floor and got as far as the foyer, where she drank the water one of the men gave her. Defendant then escorted her down the basement steps and made her lie on a couch in the recreation room, tied and gagged her, and put a sheet over her head. While on the couch she heard thumping sounds and footsteps overhead. She then heard voices outside coming from the direction of the driveway, and the sound of a car being driven into the garage. She heard an automobile leave at about 2 P.M.; the noises from the garage ceased. Mrs. Davis managed to free herself from her bonds and phoned the police.
Mr. Cohen testified that upon his return home in mid-afternoon he found his bedroom ransacked, the closet door ripped open, and the safe gone. He described the missing property. Other State's witnesses, who had been in the neighborhood at the time of the robbery, corroborated the time element but did not identify the robbers. Finally, the three West Orange police officers who arrested defendant at his home in New York City testified as to his statements when they questioned him concerning his whereabouts on the day of the robbery. The first was Detective-Sergeant Palardy who said defendant had told him that he was "hanging around his house all day long"; that "in the afternoon he was around his home most of the time," and that he had a date to meet two Brooklyn narcotics detectives at 4 P.M. When Palardy asked him for their names defendant *322 replied, "I am not going to tell you any more. You can beat me up or throw me down the sewer. That is all I am going to say." Palardy's testimony was substantially corroborated by the other two officers. All three remained unshaken on cross-examination, when defense counsel suggested that defendant might actually have said that he had been in the "vicinity of his home." It appears from the record that after his arrest and the holding of hearings, defendant was extradited to the State of New Jersey.
The sole defense was alibi, testified to by seven witnesses who had a fairly close acquaintance with defendant. All said that defendant was in a certain restaurant in lower Manhattan from sometime before 1 P.M. until after 2 P.M. on the day in question. Included among these witnesses were three attorneys, an accountant, and the restaurant owner himself. Their recollection of who was in the restaurant and what the several persons present were doing during the busy lunch hour was unusually detailed. They were all certain of the day and time, and their stories were quite consistent.
We shall consider the points in the order of their presentation.

I.
Defendant argues that the State failed to prove a robbery within the meaning of N.J.S. 2A:141-1 because it did not establish that the property, located in the upstairs bedroom closet, was taken from the person of Mrs. Davis, or that it was in her presence and in her custody, citing State v. Lyons, 70 N.J.L. 635, 645 (E. & A. 1904). He claims that robbery is distinguished from other crimes by the use of violence to deprive a person of possession of property that is directly under his supervision, care, control and custody; and if the property is not in the presence and custody of the threatened individual, there can be no robbery. No such issue was raised at the trial; the issue there was not whether the crime of robbery had been committed, but solely whether or not it had been committed by defendant. Indeed, defense *323 counsel on his opening said, "I cannot quarrel with the suggestion that it [the robbery] took place as a matter of fact."
At common law the crime of robbery was defined as the felonious or forcible taking of the property of another from his person or presence, against his will, by violence or putting him in fear. 2 East, Pleas of the Crown, c. 16, § 124, p. 707 (1806); 2 Wharton, Criminal Law (12th ed. 1932), § 1083, p. 1376. Our statute is declaratory of the common law.
It is settled that the requirements of the statute are satisfied if the property is taken from an agent or employee of the owner. State v. Lyons, above. And it is equally well settled, and here undisputed, that the property need not have been in actual physical contact with the person from whom it was taken. 46 Am. Jur., Robbery, § 7, p. 142 (1943); 77 C.J.S., Robbery, § 9, p. 454 (1952). The question defendant presents is whether the employee or agent must have been given custody of the specific property itself, or whether it is enough that Mrs. Davis was given general responsibility of keeping close watch and guard over the Cohen household in the absence of the owners.
There can be no question here that Mrs. Davis, as servant and sole occupant of the Cohen home, was in charge of everything contained therein against anyone except the Cohen family. She clearly would have been remiss in her duties had she had the power to prevent a robbery and not done so. Violence to her person, or the threat thereof, was necessary to the removal of the property from her presence. We speak of "presence" because the robbery undoubtedly took place in her presence, in the sense that she saw the two men go upstairs, later heard the thumping of the safe on the steps, and then heard the voices outside and the car when it was brought into the garage and when it was driven away  all this while she was helpless and in fear of her physical safety.
There is enough here to satisfy the definition in Lyons. See, also, the text in 77 C.J.S. and 46 Am. Jur., cited *324 above; also 2 Wharton, op. cit., § 553, pp. 253-255, where it was said that
"The general rule is that it is essential, in order to constitute robbery, that the property in question be taken from the person of another, or from his possession or his presence. An actual physical removal of the property from the person of the victim is not required, and it is sufficient if the property be taken from the presence of the victim. An object is deemed within the presence of a person when it is within his area of control.
The preposition `from,' as used in defining the offense, does not convey the idea of contact or propinquity of the person and property, nor that the property is in the actual or immediate presence of the person. Hence the offense may be committed when the property, though not in the immediate presence of the owner, is under his control, as in another room of the house, or in another building on his premises."
The court's charge was proper when it said
"It is essential to the crime of robbery that there be a taking from the person or presence of the victim, but this does not require that the property should have been in actual contact with or taken from the physical person of the victim.
It is necessary that the goods shall be on the person of the owner or the owner's agent or shall be in his presence or in his custody. As a matter of law the household goods in this case were in the custody of the lady who was in charge of the house."
In our view the testimony clearly established the crime of robbery within the requirements of the statute.

II.
Defendant's second point is that the trial judge coerced the jury to arrive at its verdict. The case went to the jury at 9:30 A.M. Just before noon the trial judge rejected the jury's request to inspect a copy of the New York extradition proceedings. At 1 P.M. the jury returned to request lunch, and after being instructed on the proper procedure therefor, retired two minutes later. At 2:28 P.M. the jury again returned with a note to the court:
"The members of the jury wish me to report that no unanimous conclusion can be arrived at as of now. Moreover, we seem unable *325 to present any convincing arguments to win over those who prefer to hold out. Does the Court have any recommendations?"
The court then gave this instruction:
"Members of the Jury, the Court finds it necessary and will therefore order that you continue to deliberate, but before I send you back for further deliberation, I charge you that it is the duty of each juror while the jury are deliberating upon their verdict to give careful attention to the views his fellow jurymen present upon the testimony of the case. He should not shut his ears and stubbornly stand upon the position he first takes regardless of what may be said by other jurymen. It should be the object of all of you to arrive at a common conclusion, and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict if that is possible. The law contemplates that jurors shall by discussion harmonize their views if possible, but not that they shall compromise, divide and yield for the mere purpose of agreement.
In your further deliberations you will consider everything that I have heretofore said to you in my main charge and my first supplemental charge and this charge."
The jury retired for further deliberation at 2:30 P.M. It returned to the courtroom at 4:32 P.M. with a note from its foreman reading: "The situation remains as formerly, and I am writing this only at the request of one of the holdouts." To this the court replied, "Members of the Jury, the Court's instruction to you is to continue to deliberate, keeping in mind the main charge of the Court and the two supplemental charges of the Court." The jury retired at 4:33 P.M. and returned 12 minutes later with a verdict of guilty.
During the 12-minute interval defense counsel expressed the thought that "we have reached a point where to continue any further might have a tendency to possibly corrupt an independent opinion." When the trial judge pointed out that the tenor of the jury's note was not one of frustration or exhaustion of any possibility of reaching a verdict, and that he had acted in the exercise of discretion, defense counsel did not disagree. He made no motion, or even an informal request, that the jury be discharged.
Defendant's contention that the supplemental instructions coerced the jury is wholly without merit. The main *326 charge was carefully constructed and eminently fair, and so was the supplementary instruction given the jury when it appeared in court at 2:28 P.M. That instruction dealt with the desirability of maintaining a state of mind receptive to divergent ideas. Defendant admits that a court may send a jury back for further deliberations when it is not satisfied that all possibilities of reaching a verdict have been exhausted, but it may not coerce or unduly influence the jury in reaching a verdict. We agree that such is the controlling principle, but it has no application in the circumstances here presented. The situation and the language employed by the trial judge are totally different from that in In re Stern, 11 N.J. 584 (1953), relied on by defendant, where the trial court impressed on the jury the great expense that a new trial would entail.
The first supplemental instruction, quoted above, is the main target of defendant's fire. We observe that it was given some 2 1/4 hours before the jury reached its verdict. The attempt to relate the short space of time between the court's last instruction and the return of the verdict, to a finding of coercion, is also untenable. This instruction could not constitute prejudice since it merely referred the jury to the main charge itself and the two supplemental instructions. That some jury members changed their minds within 12 minutes after the last instruction is not a ground for impeaching the verdict. Cf. State v. McCall, 27 N.J. Super. 157, 172 (App. Div. 1953), reversed on another point, 14 N.J. 538 (1954), where the elapsed time was only five minutes.

III.
At the conclusion of the morning session on the first day the court admonished the jury not to read anything about the case in any newspaper during the trial. The next afternoon the Newark Evening News, a newspaper published in and circulating throughout Essex County, carried an article containing information that would have been inadmissible in evidence. Defense counsel called the article *327 to the attention of the court out of the presence of the jury, and moved for a mistrial. The trial judge sent for the article and examined it; the assistant prosecutor also read it, but disclaimed any knowledge as to the source of the information. The judge then sent for the jury and asked whether any juror had read anything about the case or discussed it with anyone during the course of the trial. There was no response. Defense counsel, after saying that he was sure the jurors had truthfully answered that they had not read any article, asked the trial judge to question the panel further as to whether anyone on the jury or at home had directed attention to the fact that there were newspaper articles. The court did so, and again there was no response. Thereupon the judge denied the motion for mistrial. In the ensuing colloquy defense counsel stated that he was "satisfied that the court's ruling is eminently fair under all the circumstances."
The trial court was correct in refusing a mistrial. There was no showing whatsoever that the newspaper article in question had come to the attention of any juror, or its contents been referred to or discussed with them. Cf. State v. Bentley Bootery, Inc., 128 N.J.L. 555 (Sup. Ct. 1942), affirmed 129 N.J.L. 386 (E. & A. 1943); State v. Pontery, 19 N.J. 457 (1955) (newspaper article claimed to be prejudicial; reversed on other grounds); State v. Curcio, 23 N.J. 521 (1957); State v. Petrucelli, 37 N.J. Super. 1 (App. Div. 1955), certiorari denied 350 U.S. 1000, 76 S.Ct. 556, 100 L.Ed. 864 (1956); and see Annotation, 39 A.L.R.2d 1314, 1318, 1328, 1342 (1955).

IV.
Defendant claims he was denied a public trial because his alibi witnesses were excluded from the courtroom, and any consent to such exclusion by his counsel did not constitute a waiver of his right to such trial.
The record shows that during a brief recess after the State had rested, both counsel stepped to the bench and the trial *328 judge informed defendant's attorney that the assistant prosecutor "moves that the alibi witnesses be brought into the courtroom one at a time, and I am advised that the defense counsel has no objection. It is only by consent I will order that." To this defense counsel replied, "That I understand." When the court offered to send for some cases dealing with the exclusion of witnesses, if defense counsel so desired, his answer was "No." The judge made it a point that "I don't want you to raise the question of public trial," to which defense counsel answered, "I have only one [alibi witness] here in the courtroom." A short while later in this colloquy the judge returned to the question of excluding the alibi witnesses by saying, "You will be sure when the witnesses arrive ," and was interrupted by defense counsel's statement that "I will take it upon myself. I will take it as a mandate when they arrive to keep within your Honor's ruling." It thus appears that defense counsel readily agreed to have his alibi witnesses appear in the courtroom one at a time, and volunteered his complete cooperation in arriving at that result.
Defendant now claims he was deprived of a public trial, and his counsel's waiver was not binding upon him. His argument confuses the discretionary power that a trial court normally has to exclude pending witnesses, with that of defendant's right to a public trial. State v. Haskins, 38 N.J. Super. 250 (App. Div. 1955), which defendant cites as supporting his argument, is not applicable. There the trial judge cleared the courtroom of all people except witnesses, without asking defense counsel whether he consented. Later in the trial he included in the exception members of the press, attorneys, and close relatives of defendant. The exclusion of defendant's "friends" throughout the trial was held to be error and led to the conclusion that defendant had been deprived of his right to a public trial.
The great weight of authority is that it lies in the trial court's discretion to exclude from the courtroom or separate or sequester witnesses, or "put witnesses under the rule," as the procedure is variously termed. 53 Am. Jur., *329 Trial, § 31, p. 46 (1945); Annotation, 32 A.L.R.2d 358 (1953). The situation here is governed, not by the constitutional provision guaranteeing the right to a public trial, N.J. Const. of 1947, Art. I, par. 10, but by the general rule of judicial discretion applicable to the exclusion of witnesses.
The action of the trial judge was entirely proper, and he certainly did not abuse his discretion, State v. Barts, 132 N.J.L. 74 (Sup. Ct. 1944), affirmed Ibid., 132 N.J.L. 420 (E. & A. 1945), particularly in the light of defense counsel's unequivocal consent. Cf. United States v. Sorrentino, 175 F.2d 721 (3 Cir. 1949).

V.
We next deal with the claim that the court erred when it charged the jury as to the effect of defendant's failure to take the stand in his own behalf. The pertinent part of the charge reads:
"You will remember, and I charge you this as a matter of law, that the defendant, Cottone, did not take the witness stand. Under our law a defendant cannot be compelled to testify, but he is competent to testify, and he has a right to testify. His failure to be a witness in his own behalf raises no presumption of guilt, but if facts are testified to which tend to prove his guilt, which facts he could by his oath deny, his failure to testify in his own behalf raises a permissible inference, and you will remember my definition of inference, that he could not truthfully deny those facts."
The trial judge then went on to enumerate the facts which defendant "could by his oath deny," and followed this with the statement:
"However, I charge you that it is our law that the defendant here is entitled to have you consider all of the facts in evidence, even if he does not deny, by his own oath, such facts as criminate him or tend to criminate him, and he is entitled to the presumption of innocence unless and until you, the jury, agree on a verdict of guilty upon a consideration of all the evidence."
The instruction was unexceptionable. Like the rest of the charge, it reflected the trial judge's concern that defendant *330 be afforded every protection to which he was entitled, and have the assurance that the jury would give fair and deliberate consideration to its verdict. All of the arguments defendant now advances, and many more that might be made in his behalf  as also the argument that New Jersey should part company from the small minority of states which permit a trial court to comment on a defendant's abstention from denying inculpatory facts tending to establish his guilt; see Wharton, Criminal Evidence (12th ed. 1955), § 147, and 8 Wigmore, Evidence (3d ed. 1940), § 2272  were urged by defendant on the appeal in State v. Corby, just decided by the Supreme Court, 28 N.J. 106, affirming 47 N.J. Super. 493 (App. Div. 1957). That case is dispositive of the present contention. We find the charge to be the most favorable that could possibly be made under New Jersey rule. See the concurring opinions of Chief Justice Weintraub in the Corby case and State v. O'Leary, 25 N.J. 104, 116 (1957).

VI.
Defendant complains that he was denied the right to be confronted by witnesses against him, in violation of N.J. Const. of 1947, Art. I, par. 10.
Immediately before the State rested its case the assistant prosecutor said to the court in the presence of the jury:
"Your Honor, several persons have been named throughout the course of this trial who have not been produced by the State. However, for certain reasons, some cannot be here. None of them would testify to any new matters. The only thing that would be testified to would be cumulative. Therefore at this time the State rests."
Defense counsel requested that the State, for the sake of the record, "particularize," and inquired to whom the statement was directed. The trial judge then asked if the State rested, and obtaining an affirmative answer, immediately directed the jury to disregard the assistant prosecutor's statement. He then admonished him, explaining why his *331 statement was improper, and concluded by again saying, "The jury will disregard it."
Thus, the court twice specifically directed the jury to disregard what the State's attorney had said. Defendant now claims that the first statement was unclear to the jury, and that the judge's subsequent remarks were directed only to the assistant prosecutor and not the jury. The claim is absurd on its face. Both instructions were perfectly clear and cured any impropriety that may have inhered in what the assistant prosecutor had said. The suggestion that his remark constituted plain error under R.R. 1:5-1 is without merit.

VII.
The burden of defendant's final argument is that by reason of certain remarks by the State on its opening, the jury was permitted to get the impression that defendant had a criminal record, thereby prejudicing him.
In the course of his opening the assistant prosecutor, after narrating the background facts of the case, said:
"After continuing in this investigation, the police took Mrs. Davis to several police departments to review certain photographs."
Defense counsel interrupted, stating that he had a motion to make outside the presence of the jury. The jury thereupon retired from the courtroom. In the ensuing discussion defense counsel voiced his apprehension that the assistant prosecutor was about to say that Mrs. Davis had identified defendant from rogues' gallery photographs. This, he contended, would be an indirect method of accomplishing something which the prosecution would not be permitted to do directly. The assistant prosecutor insisted that he had no intention of using the words "rogues' gallery." There followed a discussion of the propriety of telling the jury that Mrs. Davis had identified defendant's picture, omitting any reference to a rogues' gallery. The result of this conference with the trial judge was a concession by the assistant prosecutor that "It would serve the State's purpose by stating to the jury that the identification was made. I need *332 not refer to it otherwise." Following the recall of the jury, the court reporter read back the last statement made by the assistant prosecutor before the interruption, and the latter then continued by saying that after defendant had been apprehended "Mrs. Davis identified [him] as being the man who entered the residence of Mr. and Mrs. Cohen * * *."
There was no objection or motion made by defense counsel after his initial interruption of the State's opening. After resuming, the assistant prosecutor circumspectly refrained from making any reference to an identification by Mrs. Davis from rogues' gallery photographs.
We cannot perceive any prejudice visited upon defendant. Certainly he does not point out in what manner he was prejudiced, and there is nothing in the record to indicate that the jury gave the assistant prosecutor's remark, now claimed to be prejudicial, any further thought or consideration.
Our consideration of the entire case leads to the conclusion that the conviction must be affirmed.