76 N.J. Super. 347 (1962)
184 A.2d 652
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DAVID REDDICK, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1962.
Decided October 4, 1962.
*348 Before Judges PRICE, SULLIVAN and HERBERT.
Mr. Solomon Golat (assigned counsel), argued the cause for appellant.
Mr. Peter Murray, Assistant Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
*349 The opinion of the court was delivered by SULLIVAN, J.A.D.
Defendant was indicted for the robbery of $50 from the person of William Morgan and pleaded "not guilty." At his first trial the jury, after some 2 1/2 hours deliberation, reported that it could not agree on a verdict. The court then asked the jury if further deliberations would avail and was told by the foreman that "We are so far apart that present deliberation would be of no avail." The court thereupon declared a mistrial.
At defendant's second trial he made a motion to "dismiss the indictment" on the ground of double jeopardy, contending that at the first trial the court should not have declared a mistrial when it did, but should have instructed the jury to continue its deliberations. The motion was denied. At the conclusion of the second trial the jury returned a verdict of "guilty." Defendant was sentenced to serve five to seven years in State Prison.
Briefly, the State's case as established by the testimony of Morgan and corroborated as to some of the details by other witnesses, was that Morgan worked as a night attendant at a tavern in Newark and that on March 21, 1960, defendant went to the tavern after closing hours and knocked on the window to attract Morgan's attention, and through the window exhibited a note purportedly written by the owner of the tavern concerning a package in the cloak room. Morgan had known defendant since 1947. When Morgan opened the door defendant put his hand in his pocket, said he was "not kidding," and ordered Morgan into the cellar and locked the cellar door. Morgan then heard defendant walk across the floor and the "ding" of the cash register. Morgan was released from the cellar about an hour later when his shouting and banging were heard by a passerby who opened the cellar door. Morgan then ascertained that $50 of his employer's money which he had put in the cash register was missing. The police were called and were told by Morgan that defendant had committed the robbery.
*350 Defendant's story was that on the date in question he had met Morgan in a cafeteria about two o'clock in the morning and that Morgan had invited him to the tavern for a few drinks. They went there and Morgan gave defendant a couple of "double shots." Then Morgan asked defendant for the loan of $50, saying he had to go to court that day on a conspiracy charge and needed the money "to get his trial postponed." Morgan showed defendant a paper purporting to indicate that Morgan had to appear in court on March 21. Defendant, however, said he did not have any money. Approximately an hour and a half later defendant left the premises. He denied locking Morgan in the cellar or taking any money from the register. Defendant has a long criminal record, the details of which were elicited on his cross-examination.
In summation defendant's assigned counsel suggested to the jury that Morgan, the State's witness, had taken the $50 and had blamed defendant to conceal his own embezzlement. Counsel frankly admitted that his client was a "bad man" but argued that he was not so stupid as to commit a robbery for which he was bound to be apprehended. Counsel then told the jury:
"You can see that he has been experienced in the world of crime and how unfortunate are the many others with him who have turned to crime as a way of life. You can say that he has been in and out of jail. These fellows apparently think that it's all right to do anything if you can get away with it and then when you can't get away with it, you get a stretch and you get a nice soft time and you get a bed and they let you out until you do something else and get caught again.
Now, when you take a man like that, who has turned to crime as a way of life, and there is no proof that he is insane; there is no proof that this man is abnormal mentally. You heard him testify. He is a pretty suave individual. Do you think that this man would be so stupid, so insane, when there are so many ripe victims around  these women, your wives and mine, our sisters, ourselves, walking a public street and all of a sudden, 3 o'clock in the morning clonk on the head, we are left to die or bleed to death and we don't even *351 know who struck us. Do you think this man would be that stupid as to come into a joint  a saloon, where he was well-known to Mr. Morgan * * *."
As heretofore noted the jury returned a verdict of "guilty."
On his appeal defendant raises several points. We need consider only three of them.
First, it is contended that defendant has been subjected to double jeopardy because the trial court acted precipitously in defendant's first trial in declaring a mistrial after the jury reported inability to agree on a verdict.
This argument is invalid. The declaration of a mistrial because a jury cannot agree on a verdict is left to the sound discretion of the trial judge. Here, the record supports the action taken. Moreover, defendant made no objection at the time to the trial court's action. No basis for double jeopardy has been shown.
Defendant also argues that a forcible taking from the person, as charged in the indictment was not proven. Defendant points to the evidence that the money was taken from the cash register and not from Morgan's person.
State v. Cottone, 52 N.J. Super. 316 (App. Div. 1958), certification denied 28 N.J. 527 (1959), is dispositive of defendant's contention. If the money taken was in the custody or control of another it will be deemed to have been taken from his person even though it was not physically on his person at the time. 46 Am. Jur. § 7, p. 142.
Defendant also charged that his own counsel's remarks on summation heretofore detailed were highly prejudicial.
Manifestly, counsel in saying what he did, was trying to emphasize the point he had been making that the crime charged was not one that defendant would commit. However, in effect, counsel told the jury that defendant's "way of life" was the waylaying of "ripe victims" in the night, "your wives and mine, our sisters," and leaving them "to die or bleed to death."
It is beyond question that such remarks prejudiced defendant in the eyes of the jury. A better argument for putting *352 defendant behind bars, irrespective of his innocence or guilt of the particular crime charged, can hardly be imagined. Moreover, outside of the inflammatory nature of the comments, there is nothing in defendant's criminal record, as brought out at trial, to support counsel's remarks.
Normally, a defendant is bound by his own counsel's trial tactics and strategy provided that defendant's right to a fair trial is not impugned. Here, though, the impact of defense counsel's comments was so enormous that the jury could no longer be impartial. Fundamental justice requires that defendant be afforded a new trial. Cf. State v. Landeros, 20 N.J. 69 (1955).
We emphasize that ordinarily reference by defense counsel to his own client's character and criminal record is not objectionable. Counsel often do so in anticipation of and in order to de-emphasize the prosecutor's presentation. In the instant case it is counsel's comment to the jury that defendant's way of life was the mugging of women "your wives and mine, our sisters," and leaving them "to die or bleed to death" that overstepped the bounds of legitimate trial strategy.
We note that assigned counsel (not counsel on this appeal) represented defendant in two lengthy trials. In fairness to him we suggest that he be relieved of further representation of defendant and new counsel assigned.
Reversed.