720 A.2d 6 .

**John Edward HAYES**

v.

**STATE of Maryland.**

**No. 1912, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Nov. 5, 1998.

560

Gina M. Serra, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for Appellee.

Submitted before WENNER, DAVIS and BYRNES, JJ.

BYRNES, Judge.

John Edward Hayes, appellant, was convicted by a jury in the Circuit Court for Baltimore County of robbery with a dangerous or deadly weapon, robbery, use of a handgun in the commission of a felony, and assault. After merging the lesser offenses into the greater offenses, the trial court sentenced appellant to twenty years imprisonment for robbery with a deadly weapon and a consecutive five-year term without parole for the handgun violation. Appellant presents two questions for review, which we have rephrased, reordered, and renumbered for clarity:

I. Was the evidence sufficient to sustain his conviction for robbery?

II. Did the trial court err or abuse its discretion in a) substituting an alternate juror after the jury had retired to deliberate the verdict; b) failing to consider other options before substituting the alternate juror; c) excusing a juror without first questioning her to determine whether dismissal was warranted; or d) failing to question the alternate juror about his post-dismissal activities before re-seating him on the jury?

Finding no error or abuse of discretion that warrants reversal, we affirm the judgments.

## FACTS

Shahzad Malik owns and operates a Shell gas station and convenience store located at the corner of Edmondson Avenue and North Bend Road, in Baltimore County. His father, Mohammed, is employed as a cashier at the convenience store.

On the evening of June 30, 1997, Mohammed was working at the convenience store when a woman arrived and asked to be let inside. The doors to the store were locked as they routinely were after dark. Because the woman looked "nice," Mohammed let her in. As she entered the store, a man later identified as appellant entered behind her. He remained

inside the store for approximately fifteen to twenty minutes. When appellant did not make a purchase, Mohammed became suspicious. Mohammed approached appellant and asked, "Sir, how can I help you?" Appellant responded absent-mindedly, indicating that he was only looking at the merchandise. A few minutes later, he purchased a few snacks and left.

The next morning, Mohammed and Shahzad were working at the store. At about 10:00 a.m., Mohammed spotted appellant through the store windows and saw him walk around the side of the building toward the entrance. Mohammed recognized appellant as the suspicious man who had lingered inside the store the previous evening.

When appellant reached the door, he pulled a red ski mask over his head. At that moment, Shahzad was behind the counter and Mohammed was standing approximately seven to eight feet from him. Once inside the store, appellant walked toward Mohammed and Shahzad and brandished a handgun. He alternated pointing the gun first at Mohammed and then at Shahzad and ordered both men to put their hands up. They obeyed. Appellant then demanded that they give him the money in the cash register. Shahzad, who was closest to the register, quickly looked at his father. Mohammed told Shahzad to "open the cash register and just give him the money." Shahzad opened the register and handed appellant approximately $900.00 in cash. Appellant ordered the men to lie down on the floor. After they did so, appellant exited the store.

The men remained on the ground for about five seconds before getting up. Mohammed immediately called 911 while Shahzad hurried outside to follow appellant. Shahzad spotted appellant getting into a Toyota Camry in the store parking lot and caught a glimpse of the vehicle's license plate number as it sped away. Shahzad went back inside the store and reported his observations to Mohammed, who relayed the information to the 911 operator.

The next day, the police traced the license plate number provided by Shahzad to a vehicle that was owned by appellant

and that matched the description Shahzad had given them. Shahzad later identified appellant's vehicle as the getaway car. The police also obtained a search warrant for appellant's apartment. In appellant's bedroom, they found a handgun underneath a chair. The barrel of the gun recovered by the police resembled the barrel of the gun used in the robbery. Appellant was arrested and charged with robbing Mohammed. He was not charged with robbing Shahzad.

Appellant denied any involvement in the robbery and provided an alibi. The police were unable to substantiate his story. At a lineup on July 10, 1997, Mohammed identified appellant as the robber.

Additional facts will be recited herein as necessary to our discussion of the issues.

## DISCUSSION

### I.

At the close of all of the evidence, appellant moved the trial court for judgment of acquittal on the ground that the evidence was insufficient to support a conviction for robbery of Mohammed. Specifically, appellant argued that he could not be found guilty of robbing Mohammed as a matter of law because the evidence neither established that Mohammed was the store owner nor that he had handed over the money from the cash register. Appellant maintained that, at best, the evidence proved that he was guilty of robbing Shahzad, a crime for which he had not been charged. The trial court denied his motion. Appellant now contends that that ruling was in error.

■ The standard of review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Albrecht*, 336 Md. 475, 478–79, 649 A.2d 336 (1994).

■ Maryland retains the common-law definition of robbery, which is the "felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear." *Tilghman v. State*, 117 Md.App. 542, 568, 701 A.2d 847 (1997) (citation omitted), *cert. denied*, 349 Md. 104, 707 A.2d 90 (1998). The "person or presence" element of the crime means that "the taking must be from the person or presence of the victim, as well as from his possession." Wayne R. LaFave & Austin W. Scott, Jr., 2 *Substantive Criminal Law*, § 8.11(c), at 442 (1986)(footnote omitted). Appellant argues, in essence, that the "person or presence" element of robbery is satisfied only when the stolen property is taken from its owner or from the person having physical possession of it and, therefore, because Mohammed neither owned the store nor was in actual, physical possession of the money in the cash register, there was insufficient evidence to convict appellant of robbing him.

■ Appellant's interpretation of the "person or presence" element of the crime of robbery is legally incorrect in two respects. First, it is well settled that ownership of property taken by force or threat of force is not a necessary predicate to robbery. *See State v. Colvin*, 314 Md. 1, 20, 548 A.2d 506 (1988); *Tyler v. State*, 5 Md.App. 158, 161, 245 A.2d 592 (1968), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1846, 26 L.Ed.2d 274 (1970); *Harrison v. State*, 3 Md.App. 148, 152, 238 A.2d 153 (1968) (per curiam). The State need only prove that the robbery victim had lawful possession or custody of the property at the time of the taking. *See Lee v. State*, 238 Md. 224, 226–27, 208 A.2d 375 (1965); *see also Creecy v. State*, 235 Ga. 542, 221 S.E.2d 17, 19 (1975)("Robbery is a crime against possession, and is not affected by concepts of ownership."); *State v. Cittadino*, 628 So.2d 251, 255 (La.Ct.App.1993)(explaining that "it is the victim's greater possessory interest in the property stolen vis-a-vis the accused that is key in proving robbery").

In *Harrison v. State, supra*, 3 Md.App. 148, 238 A.2d 153, we affirmed the defendant's conviction for armed robbery of a

store employee, explaining that the property need not have been taken from its owner. *Id.* at 152, 238 A.2d 153. To convict the defendant of robbery, it was necessary only that the State demonstrate that the property was taken "from someone who had custody over [it] and who had a legal interest or special property interest in the goods." *Id.* (citation omitted). We reasoned that the store employee had a sufficient interest in the money that was taken from the cash register because "she was in charge of the store at the time of the robbery, had authorized access to the cash register in making sales of the store merchandise and had custody and control of and responsibility for the moneys in the register." *Id.* at 153, 238 A.2d 153; *see also State v. Cottone,* 52 N.J.Super. 316, 145 A.2d 509, 514 (App.Div.1958) (explaining that the elements of robbery are satisfied when property is taken from an agent or employee of the owner).

In the case *sub judice,* the uncontradicted evidence adduced at trial established that Mohammed was an employee of the convenience store, that he was authorized to operate the cash register, and that he was responsible for the proceeds in the register. These facts were sufficient for a trier of fact reasonably to find that Mohammed was in lawful possession of the money that was taken in the robbery.

Second, we reject appellant's contention that his conviction should be overturned because there was no evidence that the money taken in the robbery was taken from Mohammed's actual, physical possession. The words "from his person or *in his presence,*" as used in the common-law definition of robbery, make plain that the property taken need not be in the victim's physical possession; rather, it need only be taken *in his presence, i.e.,* within the victim's immediate control or custody. *Cf. Ball v. State,* 347 Md. 156, 189, 699 A.2d 1170 (1997) ("The law is settled that the victim of a robbery need not be in the same room of the dwelling from which property is taken in order for the 'person or presence' element of robbery to be satisfied."), *cert. denied,* —— U.S. ——, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998); *see also State v.*

*Reddick,* 76 N.J.Super. 347, 184 A.2d 652, 654 (App.Div.1962) ("If the money taken was in the custody or control of another it will be deemed to have been taken from his person even though it was not physically on his person at the time."); LaFave & Scott, *supra,* § 8.11(c), at 443 (explaining that property is taken from the victim's presence if the robber confines the victim "in one room of a building and then helps himself to valuables located in another room of the same building").

In *State v. Colvin, supra,* 314 Md. 1, 548 A.2d 506, the Court of Appeals rejected the contention that because the defendant had murdered a houseguest in the entrance hallway before removing property from an upstairs bedroom the robbery had not occurred in the victim's presence. *Id.* at 19–20, 548 A.2d 506. Although the Court did not expressly define the scope of the "person or presence" element of the crime of robbery, it agreed with the reasoning underlying *State v. Cottone, supra,* in which the court upheld a robbery conviction of a defendant who had locked the victim in the basement before taking property from other rooms in the house. *Id.* at 20, 548 A.2d 506 (citing *Cottone,* 145 A.2d at 513). The court in *Cottone* explained that the victim, a maid, who had been alone in the house, "was in charge of everything contained therein against anyone except the [home owners]," and therefore the taking had occurred in her presence because "[v]iolence to her person, or the threat thereof, was necessary to the removal of the property." 145 A.2d at 513.

*Colvin* supports the conclusion that the "person or presence" element of the crime of robbery is satisfied if the property taken is close enough to the victim and sufficiently under his control that he could have prevented the robbery had he not been subjected to violence or intimidation. *See People v. Braverman,* 340 Ill. 525, 173 N.E. 55, 57 (1930) (noting that the "presence" element requires "that the property should be in the possession or under the control of the individual robbed in such a way … that violence or putting in fear [is] the means used by the robber to take it"); *Commonwealth v. Rajotte,* 23 Mass.App.Ct. 93, 499 N.E.2d 312, 314

(1986) (stating that robbery "is understood to include the common law conception of taking in a victim's 'presence' and covers cases where the victim could have prevented the taking, had he not been intimidated")(internal quotation marks and alterations omitted) (citation omitted). Moreover, no logical distinction may be drawn between those cases in which property has been taken from an inanimate object within the victim's immediate control or custody, *e.g.*, a cash register, and the case *sub judice*, in which the money was taken from a person within the victim's immediate control. In both instances, the "person or presence" element is satisfied as long as the victim could have prevented the taking had he or she not been subjected to force or the threat of force. *Cf. Commonwealth v. Stewart*, 365 Mass. 99, 309 N.E.2d 470, 476 (1974) (reasoning that if violence or putting in fear were used to deter a customer from intervening or calling the police, a charge of robbery from that customer with respect to the money taken from the store cash register could be sustained).

There was ample evidence in this case to satisfy the "person or presence" element of robbery. Mohammed was a store employee who had authorized access to the money in the cash register and who was standing only a few feet from the register when the robbery occurred. A rational trier of fact could infer from those facts that Mohammed had an obligation to protect the property within his custody and control, including the money in the cash register, and that he would have done so had he not been held at gunpoint. In addition, the evidence supported a factual finding that appellant effectuated the taking by putting Mohammed in fear. The evidence was undisputed that Mohammed and Shahzad were held at gunpoint, that both men were ordered to put their hands in the air when appellant drew his gun, and that they were forced to lie on the floor to facilitate appellant's escape. Appellant's robbery conviction was supported by sufficient evidence.

## II.

The jury in the case *sub judice* consisted of twelve regular jurors and one alternate juror. At the conclusion of closing

arguments, the trial judge thanked the alternate juror for his service, discharged him, and ordered the jury to retire to the jury room to begin deliberations. The alternate juror collected his belongings and left the courtroom. The record does not indicate the time at which this occurred.

After a recess, the length of which is not reflected in the record, the trial judge returned to the bench and the following colloquy took place:

THE COURT: The record will indicate it is three minutes before one, approximately. The defendant has been returned to the courtroom.

Mr. Hayes, we have, as soon as the jury left and were to begin deliberations, one of the jurors, specifically number ten, indicated she was ill.

The alternate, although excused, had not left the building and is also available. So before we begin deliberations, it is my intention to excuse juror number ten and substitute the alternate.

I want you to be aware of that. I think it is necessary for us to do that because of the illness of the juror.

Do you understand, sir?

DEFENDANT: Yes.

THE COURT: Do you have any questions about that?

DEFENDANT: No.

DEFENSE COUNSEL: I would note an objection for the record, Your Honor.

THE COURT: You may. Certainly, the objection is noted and overruled. I really think, as a practical matter, I can't do anything else.

DEFENSE COUNSEL: All I can say is, I don't want to sound callus (sic). She sat there all morning, and certainly, it was not—she was not obviously, evidently ill. She was able to listen attentively and did not interrupt the proceeding or in any way seem to have to tend to her illness, blow her nose or anything like that.

So in other words, I don't think any of us had any idea she was feeling under the weather.

THE COURT: She indicated earlier, I happened to see her, she came into chambers, and I said, can I help you, and she said, I am taken care of.

But apparently they were heating hot tea for her in the earlier break. She was not feeling well. She had stomach (sic) problems or something. So it is not brand new.

DEFENSE COUNSEL: I understand. I have noted an objection, Your Honor.

THE COURT: I understand. The alternate will be substituted for juror ten and deliberations will now be begun. They have not yet begun.

The record does not establish how long the alternate juror had been absent from the courtroom when he was reseated. The trial judge did not ask the alternate juror whether he had discussed the case with anyone or if he had been exposed to any external influences that might have affected his impartiality. Also, there is no indication from the record that the trial judge questioned juror number ten to determine whether she was in fact ill.

### A.

Appellant contends that the trial court erred in substituting the alternate juror for juror number ten after the jury had retired to consider its verdict. He points to Md. Rule 4–312(b)(3), which provides:

Non-capital cases. In all [non-capital] cases, the court may direct that one or more jurors be called and impaneled to sit as alternate jurors. Any juror who, *before the time the jury retires to consider its verdict,* becomes or is found to be unable or disqualified to perform a juror's duty, shall be replaced by an alternate juror in the order of selection. An alternate juror who does not replace a juror *shall be discharged when the jury retires to consider its verdict.*

(Emphasis added). Appellant maintains that although the rule does not expressly prohibit the substitution of an alter-

nate juror after the jury has retired to deliberate, that prohibition necessarily is implied by its plain language. He reasons that because Md. Rule 4–312(b)(3) allows for substitution only until the jury retires to consider its verdict and because it expressly provides that any remaining alternate juror "shall be discharged" at that time, an alternate juror may not be substituted once the jury has retired to deliberate.

While we agree that Md. Rule 4–312(b)(3) implicitly prohibits the substitution of an alternate juror after the jury has retired to consider its verdict, the record in this case establishes that even though the trial judge had excused the jury, the jurors had yet to start deliberating when the substitution occurred. Indeed, the trial judge found as a matter of fact that deliberations had not started, and appellant did not (and does not) challenge that finding. Rather, he maintains that, as a matter of law, the jury "retired" to consider its verdict at the moment that it exited the courtroom and that, from that point on, the trial court was without authority to substitute the alternate juror.

Neither Md. Rule 4–312(b)(3) nor the cases interpreting it specify *when* a jury has "retire[d] to consider its verdict."[1] Two federal cases interpreting Rule 24(c) of the Federal Rules of Criminal Procedure have considered the issue.[2] Because

---

**1.** Appellant cites *James v. State*, 14 Md.App. 689, 288 A.2d 644 (1972), in support. In that case, we explained that the plain language of former Rule 748, which is substantively similar to current Md. Rule 4–312(b)(3), "provides for a substitution or replacement of regular jurors by alternates up to the juncture occurring when the jury retires to deliberate its verdict. There is no provision in this [Maryland] rule for substitution of an alternate juror thereafter." *Id.* at 699, 288 A.2d 644. Because the substitution in *James* occurred in the middle of trial, however, we had no occasion to consider the precise question now before us.

**2.** Rule 24(c) of the Federal Rules of Criminal Procedure provides, in pertinent part:

Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.... An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

Rule 24(c) is worded similarly to Md. Rule 4–312(b)(3), these cases are instructive. *See Harris v. State,* 331 Md. 137, 156–57, 626 A.2d 946 (1993) ("The interpretation given a federal statute ordinarily is persuasive in interpreting a state statute patterned upon the federal statute.").

In *United States v. Cohen,* 530 F.2d 43 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976), the trial court substituted an alternate juror for a "sleeping juror" after the jury had left the courtroom to deliberate but before it had started to discuss the case. *Id.* at 48. The defendant maintained that the substitution violated Rule 24(c) because it occurred after the jury had "retire[d] to consider its verdict." *Id.* In rejecting that argument, the United States Court of Appeals for the Fifth Circuit explained:

Appellant's interpretation [of Rule 24(c) ] is too formalistic. Although the jury had been ordered to retire, it had not yet done so *because the jurors had never begun their deliberations.*

*Id.* (Emphasis added).

Likewise, in *Martin v. United States,* 691 F.2d 1235 (8th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983), the United States Court of Appeals for the Eighth Circuit concluded that the phrase "retires to consider its verdict" in Rule 24(c) "means more than simply leaving the courtroom, but requires retirement to deliberate or consider the verdict." *Id.* at 1239. In rejecting the argument that the jury had "retired" when the jurors left the courtroom after being instructed to deliberate, the court reasoned that a rigid interpretation of the rule would not comport with the established principle that the Federal Rules of Criminal Procedure "were not intended to be [ ] a rigid code to have an inflexible meaning irrespective of the circumstances." *Id.* at 1238 (quoting *United States v. Phillips,* 664 F.2d 971, 993 (5th Cir.1981)). The court also explained that such a strict interpretation would conflict with Rule 2 of the Federal Rules of Criminal Procedure, which states "that the rules are intended to provide for just determination of every criminal proceeding and

shall be construed to secure simplicity, fairness and the elimination of unjustifiable expense and delay." *Id.* at 1239.

■ The reasoning employed by the courts in *Cohen* and *Martin* in interpreting Rule 24(c) is applicable to Md. Rule 4–312(b)(3) as well. The phrase "retires to consider its verdict," as used in Md. Rule 4–312(b)(3), contemplates the actual commencement of deliberations. Although we are mindful that the Maryland Rules "are precise rubrics that are to be strictly followed," *King v. State Roads Comm'n,* 284 Md. 368, 372, 396 A.2d 267 (1979), our interpretation is consistent with both the underlying purpose of Md. Rule 4–312(b)(3) and the rules of construction that we apply to statutes and rules of procedure. *See State v. Montgomery,* 334 Md. 20, 24, 637 A.2d 1193 (1994). We explain.

■ The prohibition against substitution of an alternate juror after the jury has retired is designed to protect the defendant from the prejudice that could result from interruption and/or taint of the deliberations process. *Cf. United States v. Lamb,* 529 F.2d 1153, 1156 (9th Cir.1975) (noting that Rule 24(c) of the Federal Rules of Criminal Procedure is intended to prevent, *inter alia,* "[t]he inherent coercive effect upon an alternate juror who joins a jury that has . . . already agreed that the accused is guilty"). In *People v. Burnette,* 775 P.2d 583 (Colo.1989) (en banc), in which the Supreme Court of Colorado held that prejudice to the defendant's right to a fair trial will be presumed when there has been a mid-deliberations substitution of an alternate juror, the court explained that substitution under that circumstance is likely to be prejudicial because: (1) if jurors already have formed opinions about guilt or innocence, an alternate juror may not have a realistic opportunity to express his views and to persuade others; (2) an alternate juror may not have had the benefit of experiencing all of the interplay between the jurors that is part of the decision-making process; (3) an alternate juror will not have the benefit of the replaced juror's views, which already may have influenced the other jurors; and (4) "a lone juror who cannot in good conscience vote for conviction might

be under great pressure to feign illness in order to place the burden of decision on an alternate." 775 P.2d at 588.[3]

None of these potentially prejudicial effects are implicated when the jurors have not yet undertaken to deliberate. Accordingly, the rigid interpretation of Md. Rule 4–312(b)(3) that appellant urges upon us is not necessary to protect a defendant's right to a fair trial and would serve only to disrupt the judicial process, contrary to the dictates of Md. Rule 1–201, which provides, in part, that the Maryland Rules "shall be construed to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay." The Maryland Rules were "founded not solely upon a fetish for standardized procedure, but more often than not, good common sense." *Renshaw v. State,* 25 Md.App. 270, 275, 333 A.2d 363, *aff'd,* 276 Md. 259, 347 A.2d 219 (1975). Absent a showing of prejudice, we see no common sense reason why a defendant is entitled to a new trial solely because the substitution of an alternate juror occurred after the jury had left the courtroom, but before it had started to deliberate. We hold that the trial court did not err in substituting the alternate juror prior to the start of deliberations because the jury had not yet "retire[d] to consider its verdict."

### B.

Appellant next contends that the trial court incorrectly assumed that it had no option other than to substitute the alternate juror for the sick juror and thus erred by failing to consider other options in lieu of substitution. Specifically, he argues that the court could have (1) declared a mistrial; (2) excused juror number ten and, with the consent of the parties, proceeded with eleven jurors, or; (3) postponed the start of

---

**3.** The court cited *Peek v. Kemp,* 746 F.2d 672, 677 (11th Cir.1984), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), as an example of a case in which the only juror who entertained reasonable doubt about the defendant's guilt asked to be excused because she was nervous and upset. The juror was excused and replaced by an alternate. A few minutes later, the newly reconstituted jury returned a guilty verdict. *Burnette,* 775 P.2d at 588 n. 3.

deliberations until the next scheduled court date to allow the sick juror to recover. *See State v. Kenney,* 327 Md. 354, 362, 609 A.2d 337 (1992).

 Generally, we will not review an issue that was not raised or preserved below. *See* Md. Rule 8–131(a). To preserve an issue for appellate review, counsel first must raise a contemporaneous objection so as to "bring the position of [the] client to the attention of the lower court at trial." *Davis v. DiPino,* 337 Md. 642, 647–48, 655 A.2d 401 (1995). The purpose of this rule is to ensure fairness to all the parties and to promote judicial efficiency by affording lower courts an initial opportunity to address and possibly cure errors committed at trial. *See County Council of Prince George's County v. Offen,* 334 Md. 499, 509, 639 A.2d 1070 (1994). The failure to object at trial typically constitutes a waiver of that issue on appeal. *See Kohr v. State,* 40 Md.App. 92, 101, 388 A.2d 1242, *cert. denied,* 283 Md. 735 (1978).

 The only objection lodged by appellant concerned the court's action in accepting the veracity of juror number ten's claim of illness. Appellant did not advise the trial court of available alternatives to substituting the alternate juror for the sick juror and, more important, he did not object to the court proceeding other than in accordance with one of those alternatives. *Cf. Goren v. United States Fire Ins. Co.,* 113 Md.App. 674, 694, 688 A.2d 941 (1997) ("[I]n order for an appellate court to review the propriety of alleged actions, there must appear on the record a statement or description of the challenged conduct. Otherwise, we are left to speculate as to whether the parties actually collaborated.")(footnote omitted). Having failed to provide the trial court with the opportunity to rule differently, appellant cannot challenge the ruling now.

Even if the issue had been preserved, appellant would fare no better. First, Md. Rule 4–312(b)(3) directs in mandatory terms that a juror who is found to be disqualified before the jury retires to consider its verdict "shall be replaced by an alternate juror." In this case, the alternate juror was dis-

charged prematurely, *i.e.*, before the jury had retired to consider its verdict, but was later reinstated. Had the alternate juror not been discharged, the trial court's only option would have been to replace juror number ten with the alternate juror. Once the alternate was reinstated, that became the court's sole option again.

Second, even if we assume that, prior to reinstating the alternate juror, the trial judge could have considered and chosen among the alternatives that appellant enumerates, his failure to consider and adopt one of those alternatives would not necessarily be grounds for reversal. "[A]bsent a showing of prejudice and an abuse of discretion, the conduct of the trial judge in substituting a[n alternate] for a regular juror will not be reversed on appeal." *James*, 14 Md.App. at 703, 288 A.2d 644. The trial judge's conduct in this case is likewise subject to review for prejudice and abuse of discretion. Yet, in his brief, appellant does not argue that the trial judge abused his discretion by reinstating the alternate juror and substituting him for the sick juror instead of pursuing another (unspecified) course of action, nor does he argue that he suffered prejudice as a result of the court's conduct.[4]

## C.

Appellant next contends that the trial court abused its discretion in excusing juror number ten without questioning her to determine whether dismissal was warranted. He ar-

---

4. We note that the cases on which appellant relies to support his contention that the trial court erred in not considering and opting for an alternative to reinstatement of the alternate juror are inapposite. In *Pollitt v. State*, 344 Md. 318, 686 A.2d 629 (1996), the Court held that in a criminal case in which no alternate jurors were impaneled and one of the jurors was determined to be unable to continue to participate after the jury was sworn but before opening statements, the trial court could not substitute a new non-alternate juror for the disabled juror without the express consent of the parties. In *State v. Lipsky*, 164 N.J.Super. 39, 395 A.2d 555 (App.Div.1978), the substitution at issue took place during deliberations and the reviewing court held that the lower court did not abuse its discretion in replacing a sick juror with an alternate, under a state rule that authorized such a substitution.

gues that because "the record is silent as to whether the trial court questioned juror number ten prior to her discharge to ascertain exactly from what she was suffering and to what extent her illness was affecting her ability to complete her jury duty," the trial court abused its discretion in excusing her. We disagree.

■ Md. Rule 4–312(b)(3) provides, in part, that a juror "shall be replaced" when he or she "becomes or is found to be unable or disqualified to perform a juror's duty." The rule, however, does not provide any guidance in "defin[ing] the circumstances under which a juror shall 'become unable or disqualified' to perform his duties." *James*, 14 Md.App. at 699, 288 A.2d 644. Therefore, the decision whether to excuse a juror pursuant to Md. Rule 4–312(b)(3) is left to the trial court's discretion. *See State v. Cook*, 338 Md. 598, 615, 659 A.2d 1313 (1995).

■ Citing *Stokes v. State*, 72 Md.App. 673, 532 A.2d 189 (1987), appellant argues that the trial court abused its discretion in removing juror number ten because its actions were not "based upon a sufficient record of competent evidence to sustain removal." *Id.* at 680, 532 A.2d 189 (quoting *Commonwealth v. Saxton*, 466 Pa. 438, 353 A.2d 434, 436 (1976)). But the standard quoted from *Stokes* was later rejected by the Court of Appeals although it was not expressly overruled. *See Cook*, 338 Md. at 614, 659 A.2d 1313. In *State v. Cook, supra,* the Court held that the standard of review set out in *Stokes* applies only when the trial judge dismisses the entire jury or a specific class of jurors. *Id.* at 612–14, 659 A.2d 1313. When the trial court excuses a juror for reasons that are particular to that juror, however, its decision may not be reversed absent a clear abuse of discretion or prejudice to the defendant. *Id.* at 620, 659 A.2d 1313. As long as "the record shows *some legitimate basis* for the decision," the trial court's ruling is not an abuse of discretion. *Id.* at 618, 659 A.2d 1313 (quoting *United States v. Boyd,* 767 F.Supp. 905, 907 (N.D.Ill.1991))(alterations omitted).

 Under the more deferential standard expressed in *Cook*, the trial court is not required to conduct a hearing to address a juror's incapacity when it is obvious that the juror is unfit to continue service. *See United States v. Fajardo*, 787 F.2d 1523, 1525 (11th Cir.1986). In a closer case in which the juror's disability is less palpable, however, "some hearing or inquiry ... is appropriate to the proper exercise of judicial discretion." *Id. (citation omitted).*

 Our review of the record persuades us that there was a legitimate basis for the trial judge's decision to excuse juror number ten. The trial judge had two opportunities to observe and question the juror personally and to assess the credibility of her statement that she was experiencing stomach pains. Although the better practice would have been to question the juror on the record, given the judge's interactions with juror number ten earlier that day, there was sufficient evidence before the court from which it reasonably could conclude that she was sick and unable to continue. Thus, a hearing was not necessary. We find no abuse of discretion.[5]

---

5. Appellant has cited *Scott v. State*, 219 Ga.App. 798, 466 S.E.2d 678 (1996), and *Commonwealth v. Saxton*, 466 Pa. 438, 353 A.2d 434 (1976), to support his argument. These cases are distinguishable, however. In *Scott*, the trial judge excused a sick juror in reliance upon statements by the jury foreperson and without consulting either the defendant or the prosecution. 466 S.E.2d at 680. Moreover, the juror was discharged in the middle of deliberations. *Id.* Of particular concern to the *Scott* court was "that on four occasions during the previous day the jury had split its vote." *Id.* Thus, the trial judge's failure to verify the juror's inability to continue raised the troubling possibility that had the juror not been excused, "[s]he may have been one who voted not to convict." *Id.* In the case *sub judice*, the trial judge spoke with juror number ten on two occasions prior to removal and the substitution occurred before the jury begun deliberating its verdict.

*Saxton* is inapplicable for two reasons. First, in that case the court applied the standard of review that the Court of Appeals rejected in *State v. Cook, supra*, that "the exercise of [the trial court's] judgment [in removing a juror] must be based upon a sufficient record of competent evidence to sustain removal." 353 A.2d at 436. Second, the trial judge justified the disqualification, in significant part, on his "own opinion that ... [the juror] displayed every indicia of being a [drug] addict," *id.* (footnote omitted), which was supported only by a "doctor's in-court observations conveyed privately to the trial judge." *Id.* Moreover, the

**D.**

Finally, appellant contends that the trial court erred in failing to question the alternate juror about his post-dismissal activities before re-seating him on the jury. Specifically, he argues that the trial judge did not ask the alternate if he had discussed the case with anyone outside the courtroom or if he had come into contact with any information that might have affected his ability to deliberate impartially.

Once again, appellant did not raise this objection below and, therefore, the issue is not properly before us. *See* Md. Rule 8–131(a); *see also United States v. Collier,* 362 F.2d 135, 138 (7th Cir.) (explaining that if defense counsel "thought his client had been prejudiced by the failure of the court to question the alternate [juror] ..., he should have raised the point in the trial court at the time of the questioning, and not at this time in this court"), *cert. denied,* 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). Again, while appellant objected to the court's removal of juror number ten, his objection related only to the basis for her claim that she could not continue. The trial judge plainly stated his intention to excuse juror number ten and replace her with the already excused alternate juror. Appellant made no objection to the planned substitution at that time or when it was effected. Accordingly, he failed to preserve the issue for review.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

juror denied using drugs when questioned by the trial judge. *Id.* In contrast, the ground for removal in the case *sub judice* was not nearly as speculative. Juror number ten was excused, at her request, only after the trial court determined that she was ill.